## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| Chee Vang, Yee Vang, Xeng Thao, and Yeng Her as mother of J.Y., a minor, on behalf of themselves and all others similarly situated, | Case No. _____ |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| -v- | |
| State Farm Mutual Automobile Insurance Company, | |
| Defendant. | |

537963.16

For their Class Action Complaint, Plaintiffs Chee Vang, Yee Vang, Xeng Thao, and Yeng Her as mother of J.Y., a minor, individually and as the representatives of a class of similarly situated persons, through the undersigned counsel, allege as follows:

## I.    INTRODUCTION AND NATURE OF THE ACTION

1.    This lawsuit involves the longstanding, systematic, intentional practice by State Farm Mutual Automobile Insurance Company ("State Farm") of discriminating against insureds across the United States based on their race and/or national origin in deciding their claims for automobile-insurance health care benefits, in violation of the federal Patient Protection and Affordable Care Act ("ACA") and 42 U.S.C. § 1981.

2.    Section 1557 of the Affordable Care Act prohibits discrimination under "any health programs or activities" on the grounds prohibited under various civil rights statutes, including race, color, national origin, sex, age, and disability. *See* 42 U.S.C. § 18116(a). As such, Section 1557 incorporates existing civil-rights laws and extends those protections against discrimination to health insurance programs and health care activities toward the goal of advancing equity and reducing health disparities by protecting some of the populations that have been most vulnerable to discrimination in the health care context.

3.    State Farm provides coverage for medical expenses in connection with its automobile-insurance policies as well as individual and group health insurance policies. As described below, some states require State Farm to provide specific amounts of PIP or medical payment coverage and, in other states, State Farm provides insurance for medical

expenses through bodily injury liability coverage and health-insurance coverage. As such, all of State Farm's automobile-insurance and health policies provide health care coverage and thus constitute a health care program or activity for purposes of the ACA.

4.     In connection with this coverage, State Farm systematically and intentionally discriminates against racial and ethnic minorities through a policy of disproportionately investigating and handling automobile-insurance claims to target healthcare providers that serve minority populations, and it subjects patients treating at those providers to unnecessary, burdensome, and frequently abusive "investigations."

5.     Media reports have exposed how State Farm's investigative and claim-handling practices are part of "a carefully developed strategy to make the victims look like they are trying to defraud the insurers."[1]   State Farm's strategy is designed and intended to avoid payment of claims for treatment to State Farm policyholders who are racial or ethnic minorities.  Indeed, according to State Farm's own internal documents for investigating claims, one of the factors in deciding whether a particular provider is "suspect" is whether the provider's patients "**are from an immigrant community**" (emphasis added).

6.     To avoid paying claims from minority and immigrant patients, State Farm declares that certain providers are "suspect," and then implements a policy known as a "TIN block" or "TIN diversion," which re-directs every claim submitted by the "suspect" provider from the ordinary claim-handling process into a never-ending investigation.

---

[1]   CNN, *Auto insurers play hardball in minor-crash claims* (Feb. 9, 2007), http://www.cnn.com/2007/US/02/09/insurance.hardball.

7.    After a provider has become subject to a "TIN block" or "TIN diversion," State Farm submits standardized letters to its insureds treating with the provider, including Plaintiffs, falsely stating that State Farm is investigating claims. In reality, the claims are not being investigated and are in an indefinite holding pattern. By subjecting to the provider to a "TIN block" or "TIN diversion," State Farm has already made its decision to deny claims but it conceals that decision from its insured.

8.    As a practical matter, the only way a patient can recover on a claim is by taking legal action against State Farm and arguing that the claim should be deemed denied or is effectively denied.

9.    State Farm's TIN block or TIN diversion violates various state insurance statutes requiring that State Farm pay or deny claims within a particular period of time. State regulators have repeatedly fined State Farm for failing to decide claims within the statutory time period. Yet State Farm has continued the practice, undeterred by the regulatory fines.

10.    State Farm's investigation goes far beyond the review necessary to decide a claim.  Rather, State Farm's "investigation" is part of an elaborate process in which State Farm uses data-mining operations, "special investigation units," and outside law firms to damage, intimidate, or altogether eliminate providers that serve minority populations, and thereby discourage those populations, who are State Farm's *insureds*, from seeking policy benefits related to their injuries.

11.    This action challenges State Farm's systematic, patterned, and intentional practice of targeting healthcare providers who treat minority and immigrant automobile-

accident victims (many of whom do not speak English as their first language), launching sham, discriminatory investigations against them, and manipulating information from those sham investigations to avoid paying claims of the minority and immigrant insureds who seek benefits under State Farm's policies.

12.    Despite a number of lawsuits around the United States over State Farm's practices, State Farm has managed to keep the program's inner workings largely hidden from insureds, their healthcare providers, and insurance regulators.

13.    Plaintiffs Chee Vang ("Mr. Vang"), Yee Vang ("Ms. Vang"), Xeng Thao ("Mr. Thao"), Yeng Her ("Ms. Her"), and J.Y., a minor, have been damaged by State Farm's fraudulent scheme.    Despite paying premiums to State Farm for insurance coverage, Plaintiffs—all racial minorities in the United States—were denied access to the healthcare provider of their choice.

14.    Plaintiffs were also subjected to the stress and the time commitment of being dragged through unwarranted, bogus investigations by State Farm.

## II.    JURISDICTION

15.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because this is a civil action between citizens of different states where the matter in controversy exceeds the sum of seventy-five thousand dollars ($75,000), exclusive of interest and costs.

16.    Alternatively, this Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) for Plaintiffs' claims arising under federal law.

17.    This Court has personal jurisdiction over this action.  The Court has general personal jurisdiction over this action because State Farm is incorporated in and has its principal place of business in this District.  Alternatively, the Court has specific personal jurisdiction over this action because Plaintiffs allege that State Farm took actions in this District to effect the policies of which Plaintiffs complain.  The exercise of personal jurisdiction over State Farm comports with due process under the United States Constitution.

18.    Venue is appropriate in this Court pursuant to 28 U.S.C. §1391(b)(1) and (2) because, *inter alia*, the Defendant resides or may be found in this judicial district and a substantial part of the events giving rise to the claim occurred in the Central District of Illinois.  Additionally, venue is appropriate in this Court pursuant to 28 U.S.C. §1391(b)(3) because State Farm is subject to personal jurisdiction in this judicial district.

### III.    PARTIES

19.    Plaintiff Chee Vang is a citizen of the state of Minnesota, Hennepin County, and was insured under a no-fault automobile-insurance policy issued to him by State Farm Mutual Automobile Insurance Company at all times relevant to this Complaint.

20.    Plaintiff Yee Vang (no relation to Plaintiff Chee Vang) is a citizen of the state of Minnesota, Hennepin County, and was insured under a no-fault automobile-insurance policy issued to her by State Farm Mutual Automobile Insurance Company at all times relevant to this Complaint.

21.    Plaintiff Xeng Thao is a citizen of the state of Minnesota, Ramsey County, and was insured under a no-fault automobile-insurance policy issued to Mr. Thao and his wife Yeng Her by State Farm Mutual Automobile Insurance Company at all times relevant to this Complaint.

22.    Plaintiff J.Y., a minor, is the biological daughter of Yeng Her, and a citizen of the state of Minnesota, Ramsey County. She was insured under a no-fault automobile-insurance policy issued to Mr. Thao and Ms. Her by State Farm Mutual Automobile Insurance Company at all times relevant to this Complaint.

23.    All of these named Plaintiffs derive from the Hmong people, an ethnic group largely based in East and Southeast Asia that began immigrating to the United States in the late 1970s.

24.    Defendant State Farm Mutual Automobile Insurance Company is an insurance corporation incorporated under the laws of the State of Illinois, with its principal place of business in Bloomington, Illinois, and is, therefore, a citizen of Illinois. State Farm has about 15,000 employees in Bloomington.[2]

---

[2] Maria Nagel, *State Farm to hire 200-300; sets jobs expo in Bloomington*, The Pantagraph (May 12, 2018), https://www.pantagraph.com/business/local/state-farm-to-hire---sets-jobs-expo-in/article_ea50b2e1-f1b0-501b-ad6c-738796a1ba71.html.

25.    State Farm sells automobile-insurance coverage to its customers which policies include coverage for health care, including, among other things, bodily injury protection, medical payments (also known as Personal Injury Protection or "PIP"), uninsured motorist benefits, underinsured motorist benefits, and liability payments for bodily injury arising out of automobile accidents.  By providing health care coverage in nearly every automobile-insurance policy it sells in the United States, State Farm's principal activity—i.e, underwriting and administering policies of insurance—involves providing health-related insurance coverage to State Farm insureds. Thus, as described below, State Farm is engaged in a "health program or activity" as the phrase is used in 42 U.S.C. § 18116(a).

## IV.    FACTUAL ALLEGATIONS

### A.    State Farm's Obligations to Pay for Medical Expenses

26.    State Farm provides coverage for medical expenses in two ways: (1) as part of automobile insurance policies in various states; and (2) as part of health insurance products sold by State Farm directly and jointly with other insurance companies.

### *State Farm's automobile insurance policies.*

27.    Nearly every state in the country requires automobile insurers to provide coverage for medical expenses resulting from an automobile accident. Some states require liability insurance, which covers bodily injury to another, while other states require personal injury protection (PIP), which covers healthcare expenses incurred by the insured and passengers.

28.     For example, Illinois law requires that owners of vehicles must maintain liability coverage that includes coverage for bodily injury; drivers in Illinois are required to have coverage for medical expenses they cause to be incurred by another driver. *See* 625 Ill. Comp. Stat. Ann. 5/7-601.   In Illinois, PIP coverage is not mandatory, but many individuals purchase PIP coverage to insure against injuries to themselves as the result of an accident.

29.     Many states have adopted "no-fault" reparation statutes that require insurance companies to provide compensation for injuries suffered in motor-vehicle accidents.  Stuart M. Speiser *et al*., *"No-fault" theories and plans*, 1 American Law of Torts § 1:42 (West, March 2017 update). No-fault insurance is compulsory in thirteen states, and optional in another eleven.

30.     The various no-fault statutes vary in detail as to their compulsory nature and added optional features, their effect on tort liability, and the extent of the limitation on tort litigation. Despite these variations, all states' no-fault acts provide compensation to injured persons, including for health-related services.  Thus, in "no-fault states," compensation for healthcare treatment and health-related services is required, and some states require minimum coverage amounts.

31.     No-fault "represents a latter-day attempt by the states to improve the mechanism for recovery by those injured and damaged in accidents arising out of the use of motor vehicles." *Ford Motor Co. v. Ins. Co. of N. Am.*, 669 F.2d 421, 425–26 (6th Cir. 1982) (discussing Michigan's no-fault insurance law).  So-called "no-fault states" have ensured that "victims of automobile accidents would be compensated irrespective of fault

. . . by their own insurers rather than recovering from the insurance company of the person 'at fault' for an accident." *Dimond v. Dist. of Columbia*, 792 F.2d 179, 182 (D.C. Cir. 1986) (discussing constitutional challenges to District of Columbia's compulsory/no-fault motor-vehicle insurance act).

32.  For example, Florida's no-fault statute is meant to "provide swift and virtually automatic payment so that the injured insured may get on with his [or her] life without undue financial interruption." *Geico Gen. Ins. Co. v. Virtual Imaging Servs., Inc.*, 141 So. 3d 147, 153 (Fla. 2013) (cleaned up).  Michigan's no-fault act is "designed to remedy problems with the traditional tort system" in resolving automobile accidents, including  undercompensation for serious injuries and discrimination against "those with low income and little education." *McCormick v. Carrier*, 795 N.W.2d 517, 523 (Mich. 2010) (quoting *Shavers v. Attorney Gen.*, 267 N.W.2d 72, 77 (1978)).

33.  Most states also have statutory payment deadlines—a time by which insurers are expected to pay claims.  For example, in New York, first-party automobile insurance benefits "are overdue if not paid within 30 days after the claimant supplies proof of the fact and amount of loss sustained."  N.Y. Ins. Law § 5106 (McKinney); *see also* N.Y. Comp. Codes R. & Regs. Title 11, § 65-3.8 (2018) (30-day payment/denial regulations).

34.  In Minnesota, benefits "are overdue if not paid within 30 days after the reparation obligor receives reasonable proof of the fact and amount of loss realized, unless the reparation obligor elects to accumulate claims for periods not exceeding 31

days and pays them within 15 days after the period of accumulation." Minn. Stat. § 65B.54, subd. 1.

35.   In at least two instances in 2019, State Farm entered into consent orders with the Minnesota Department of Commerce to settle allegations that State Farm had not resolved insurance claims within 30 days.   State Farm agreed to pay a $2,500 civil penalty to settle one of the complaints and a $1,500 civil penalty to settle the other.

36.   In Florida, even when an insurer contends that fraud has occurred, the insurer still must deny or pay a claim with interest within 90 days. Fla. Stat. § 627.736(4)(b).

37.   In Kentucky, benefits are generally overdue if not paid within 30 days after the insurer receives "reasonable proof" of the loss.  Ky. Rev. Stat. § 304.39-210.

38.   In Massachusetts, an insurer's failure either to settle the plaintiffs' claims for personal-injury protection benefits or provide reasons for nonpayment under the PIP statute, and its failure to conduct a prompt and reasonable investigation under state law, causes injury by forcing plaintiffs to institute litigation. *Jucino v. Commerce Ins. Co.*, 2011 Mass. App. Div. 285, 2011 WL 6890187, *4 (Mass. App. Ct. Dec. 23, 2011) (citing Mass. Gen. L. Ch. 90 § 34M).

39.   Even states that do not require PIP coverage often have mandatory requirements for paying or denying claims.  See, e.g., *Millers Mutual Insurance Ass'n of Illinois v. House*, 286 Ill. App. 3d 378 (5th Dist. 1997); 215 Ill. Comp. Stat. Ann. 5/155 (allowing attorney fees in case where insurer unreasonably delays in settling a claim

40.     State Farm is aware of these statutory and legal requirements, but has ignored these laws by creating a system that delays claim decisions well beyond the statutory requirements while State Farm pretends to be investigating the claims.

### State Farm's Health Insurance Policies

41.     In addition, State Farm issues policies to insure groups and individuals for health coverage.  State Farm is licensed to provide health insurance coverage in Illinois and other states, and sells individual policies on various state health-insurance exchanges.

42.     State Farm Mutual Automobile Insurance Company receives federal financial assistance in many forms, including through direct payments in connection with State Farm's Medicare Advantage plans and Medicare Part D and through subsidies and tax credits in connection with products sold through ACA health insurance exchanges.

43.     State Farm Mutual Automobile Insurance Company is registered as a health-insurance company in multiple states, and has received approval in multiple states to issue and sell health-insurance policies to individuals.

44.     State Farm Mutual Automobile Insurance Company is the parent company of State Farm Health Insurance Company.  Both through State Farm Health Insurance Company and on its own, State Farm Mutual Automobile Insurance Company provides large and small group health insurance in Illinois and, on information and belief, in other states as well.

45.     The Center for Medicare and Medicaid Services ("CMS") also identifies State Farm Mutual Automobile Insurance Company as a health insurer that provides coverage for health policies.

537963.16                                          11

46.    State Farm Mutual Automobile Insurance Company also offers and aggressively markets Medicare supplement plans, known as a "Medigap" plan, in many markets across the United States, and provides insurance to Medicare recipients.

47.    In addition to the health programs and health-insurance activity undertaken on its own, State Farm receives payments – including federal subsidies – to provide health-insurance coverage to individuals along with other health insurers such as Blue Cross and Blue Shield entities, Assurant Health, and Humana.

48.    State Farm agents are "licensed, appointed, and certified" to sell Humana's Medical Advantage and Medicare Part D plans.  State Farm has entered into marketing agreements with Humana to sell Medicare Advantage Plans. *See* Testimony of Heidi Margulis, Senior Vice President, Government Relations, Humana, Inc. before U.S. Senate Special Committee on Aging, Medicare Advantage Marketing and Sales: Who Has the Advantage? (May 16, 2007).

49.    In addition to its relationship with Humana, State Farm entered a contract to exclusively sell individual health plans affiliated with Blue Cross Blue Shield entities on the individual health-insurance markets in Illinois, Texas, Oklahoma, New Mexico, and Montana, including ACA health-insurance exchanges.

50.    In 2014, as individuals and businesses began to purchase individual policies through state health-insurance exchanges, State Farm created websites aimed at selling health insurance along with other insurance policies, and sent postcards to consumers touting State Farm's "Health and Dental Protection You Can Count On." State Farm advertised its ability to provide consumers with "quality health and dental coverage at an

affordable price" in connection with Assurant Health. According to media reports in 2014, State Farm agents planned to market health insurance both on and off the Affordable Care Act health-insurance exchanges. "Through exchanges, consumers who are eligible for financial assistance can shop and obtain help in paying premiums. … Plans will be available in every zip code of each state." *See Like a Good Neighbor, State Farm to Offer Health Insurance*, Media Logic (Oct. 13, 2014), https://www.medialogic.com/blog/healthcare-marketing/like-good-neighbor-state-farm-offer-health-insurance/ (emphasis added).

**B.      State Farm engages in a company-wide scheme to evade paying claims submitted by individuals belonging to racial and ethnic minority groups.**

51.    From at least 2004 to the present, State Farm has greatly expanded its marketing directed to immigrant and minority communities.  For example, State Farm has focused on increasing its advertising in languages other than English, and has held events in minority communities.

52.    But during the same time that it has solicited immigrant populations to become insureds and pay premiums, State Farm has increased its efforts to systematically avoid paying claims to members of racial and ethnic minorities. State Farm has intentionally used special investigation units ("SIUs") for the purported purpose of detecting fraud in the submission of claims, but for the actual purpose of intimidating members of racial and ethnic minority groups and avoiding payment of claims.

53.    In recent years, the SIU units have evolved to focus largely on claims arising from automobile accidents in metropolitan areas and the medical providers who

treat patients injured in those accidents. State Farm has shifted the entire focus of its SIUs from handling individual claims to conducting "multi-claim investigations" of healthcare providers.

54.    State Farm created Multi-Claim Investigation Units ("MCIUs") to reflect this new focus on evaluating large numbers of claims looking for so-called treatment "patterns" that could be characterized in hindsight as "fraudulent."

55.    State Farm solicited internal and external data analyses to identify healthcare providers with purported treatment patterns, sharp increases in billing, or high volume of billing.

56.    Once it identified providers meeting these parameters, State Farm identified them as "projects."

57.    Manufacturing provider "projects" became the primary goal of State Farm's MCIUs.

58.    There are built-in incentives for State Farm employees to manufacture claims of fraud where no fraud actually exists.  State Farm bases MCIU representatives' career advancement and salary increases on the number of healthcare-provider projects they generate and successfully complete.

59.    To make the pursuit of healthcare-provider projects uniform in execution across the United States, State Farm developed a written "playbook" for its MCIU personnel.  The playbook outlines all the steps to follow when accusing a doctor of fraud.

60.    Accusing doctors and patients of fraud in a publicly filed lawsuit is a goal of State Farm's medical provider projects.

61.    Once a doctor comes to represent a significant cost to State Farm, and that doctor is targeted as a "project," all claims involving that doctor are funneled to specially designated MCIU staff, who search treatment and billing records for patterns that can be characterized as fraudulent.

62.    These specially assigned MCIU claim representatives regularly use the handling of underlying claims, especially where the underlying claim is in litigation, as platforms to discredit the targeted doctor with the insured, state regulators, law-enforcement officials, the doctor's employees, and others.

63.    Identifying and pursuing a healthcare-provider project to completion often requires years of work and can encompass hundreds of underlying claims.

64.    In pursuing a project, State Farm subjects its insureds in the underlying claims to unnecessary, accusatory, even harassing interviews and litigation to gather information it hopes to use to evade the claims and put the targeted doctor (who serves the immigrant and minority insureds) out of business.

65.    State Farm rarely attempts to prove that individual underlying claims are fraudulent. Rather, State Farm attempts to manufacture a presumption of fraud based on overall billing and treatments rendered by a doctor over several years. State Farm deliberately wields its data and anti-fraud tools disproportionately against minority and immigrant patients and their healthcare providers.

66.    If State Farm threatens or files a lawsuit alleging fraud against minority and immigrant patients and their healthcare providers, the lawsuits typically are designed and

intended to intimidate doctors who bill State Farm, and therefore stop claims from minority populations.

67.    Upon information and belief, State Farm uses special databases to gather and analyze claim payment information to create the appearance of a pattern that it can use to allege fraud.

68.    The Potential Fraud Management Tool ("PFMT"), a nationwide repository of information about medical providers that State Farm has gleaned from individual claims, has been identified as one such database.

69.    Another such database is the Value Assessment Tool ("VAT"), a repository of payments by MCIU adjusters, which enables State Farm to assess the effectiveness of the provider "projects."

70.    State Farm analysts mine the PFMT, VAT, and other databases to identify which doctors cause State Farm to pay the most in automobile-accident bodily-injury claims.

71.    State Farm's MCIUs create reports identifying how much a particular provider has billed State Farm, for instance by calendar quarter.  The MCIU reports do not result in State Farm targeting nonminority, nonimmigrant providers, or providers who serve nonminority, nonimmigrant communities.

72.    Before and during the entire course of its campaigns against disfavored providers who are minorities or immigrants (or who serve minority and immigrant communities), State Farm keeps data on spreadsheets regarding the total dollars billed by various health-care providers.

73.     Although State Farm collects and compiles data about the highest-billing providers, it uses that data to target minority and immigrant providers, thereby intentionally discriminating against its minority and immigrant insureds.

74.     State Farm and its SIU personnel also track usage of certain Current Procedure Technology ("CPT") codes, targeting providers who rank high on these lists. CPT codes were jointly developed by the American Medical Association and the Health Care Financing Administration and are standardized nomenclature for use in insurance claims.

75.     These reports help State Farm decide which minority or immigrant doctors (or doctors serving minority and immigrant communities) would save it the most money to target as a "project," thereby eliminating and avoiding claims from minority and immigrant insureds.

76.     State Farm tracks the frequency with which medical providers have patients in common, in the hope that State Farm can characterize them as "co-conspirators" in a project.

### *Blocking Payments; Sham Investigations.*

77.     While analyzing underlying claims for a project, State Farm's MCIUs often issue a TIN diversion. "TIN" stands for tax identification number and is the identifier State Farm uses to track and research providers that submit bills.    State Farm disproportionately issues TIN diversions against providers who are minorities or

immigrants (or who serve minority and immigrant communities), with the intent to eliminate and avoid claims from minority and immigrant insureds.

78. After State Farm imposes a TIN diversion, any claim it receives with the provider's tax-identification number is flagged and routed to State Farm's SIU/MCIU staff.

79. State Farm uses the TIN diversion to delay insurance benefit payments in individual claims to a targeted provider while its MCIU staff and outside counsel "investigate" the patient and provider.

80. The individual insureds' claims are subject to "investigation" through no fault of their own and without regard to any individual issues regarding their claim. Instead, all insureds who receive service from a healthcare provider subject to State Farm's TIN diversion are treated differently from insureds who receive treatment from a healthcare provider who is not subject to a TIN diversion. State Farm knows that its practice discriminates against minority insureds but continues the practice anyway.

81. While the TIN diversion is in effect, State Farm frequently requests that the provider's patients submit to a recorded examination or an "Examination Under Oath" ("EUO"), which is a tool used by insurers to record and/or transcribe an interview of an insured, often by one of the insurer's outside counsel. Insureds can be, but are not necessarily, represented by counsel during an EUO.

82. State Farm will even refer that provider's insureds for EUOs before it receives or reviews the provider's bills and the insureds' medical records, solely on the basis of the patient being treated by that provider.

537963.16                                          18

83.     State Farm demands and performs the EUOs knowing that its insureds, under fast-paced questioning by its counsel about accident details and medical treatment that occurred several months earlier, will likely be unable to remember every detail of those events.

84.     Upon information and belief, the time between these State Farm insureds' accident dates and their EUO is often several months and can even be more than a year.

85.     Many or most of the insureds summoned for EUOs are immigrants who do not speak English as a first language.  Translators are involved in many or most of these EUOs, adding a further filter and potential confusion to the questions and answers.

86.     State Farm designs EUOs to confuse or mislead insureds so that State Farm can later cherry-pick the insureds' answers, including – for example – any instance where an insured is not able to recall certain documented procedures or events.

87.     State Farm's goal in these EUOs is not to genuinely investigate whether its insureds' medical bills are reasonable and necessary under the No-Fault Act.   Its patterned questions, substantially the same in every EUO, are designed to support its predetermined outcome by tripping up insureds, and taking advantage of insureds' incomplete memories,  misunderstandings, or English-language difficulties to support a denial of some or all bills.

88.     State Farm directs its counsel to send letters to insureds or their lawyers after the insureds undergo EUOs, in which counsel state that State Farm was engaged in a "continuing investigation of the loss," even when there is no genuine "continuing investigation" of the claim.

89.     State Farm also may impose a TIN block that prevents any payment from being made to a targeted doctor, regardless of the treatment provided or injuries suffered. As with the TIN diversion, all insureds who receive service from a targeted healthcare provider TIN-blocked by State Farm are treated differently from insureds who receive treatment from a healthcare provider who is not targeted. State Farm knows that its practice discriminates against minority insureds and creates a clear and significant imbalance in its treatment of its insureds based on their race, ethnicity, and nationality. The insureds' race, ethnicity, and/or national origin motivates State Farm's decision to impose TIN diversions and TIN blocks on providers.

90.     State Farm does not inform the targeted provider or patients-insureds that it has imposed a TIN block and that the TIN block is the reason State Farm is not paying the targeted provider. Instead, State Farm falsely notifies the targeted provider and patient-insureds that claims are being "investigated."

91.     Once a TIN block is in effect, State Farm abandons any pretense that it is actually evaluating the insured's claims or the provider's bills.

***Racial, ethnic, and nationality discrimination.***

92.     Injury and property-damage vehicle crashes are common in America's urban areas. In Illinois, Cook County was home to 41% of the state's population in 2016 but had 51% of all crashes. Upon information and belief, a large number of these motor-vehicle accidents involved drivers and passengers who are minorities and immigrants.

93.     Many of these accident victims do not speak English as their native language.  The four named plaintiffs here are Hmong and, in Minnesota, many accident victims are of Hmong, African, or Asian descent, and many are Hispanic or Latino.

94.      State Farm disproportionately investigates claims by minority and immigrant insureds and the healthcare providers who serve them.

95.     State Farm's practice of targeting health-care providers that serve minority communities and immigrant communities, and therefore discriminating against such patients, is a company-wide, systematic, intentional policy and is State Farm's standard operating procedure.

96.     State Farm once instructed its claims personnel in an internal memorandum that certain providers should be subject to greater scrutiny in part because their "[p]atients are from an *immigrant community*."  Listing sixteen clinics, State Farm told the claims personnel that "[a]ny treatment received from these providers is suspect." (Emphasis added.)

97.     State Farm improperly forces meritorious claims into no-fault arbitration so that it can use the arbitration process as a "fishing expedition" to gather more information to use against the targeted providers and their patients.

98.     State Farm's boilerplate delay letters usually purported that State Farm was investigating each claim on its merits, when that was untrue—everything it had done and was doing was designed to support its preconceived notion that the provider in question was not entitled to payment.

99.     State Farm targets providers and their patients in this manner because a high percentage of the patients do not speak English as their first language and are from minority and immigrant communities that are more easily scared away from using their rightful no-fault insurance benefits than insureds born in the United States.

100.    As noted above, State Farm repeatedly tries in the EUOs to confuse, browbeat, or intimidate the minority and immigrant insureds about the treatment they received from their provider(s) or documents they filled out at the office of the provider(s).

101.    During one arbitration in 2015, the arbitrator made a point of scolding State Farm for denying claims owed to an insured with an Arabic or East African name after State Farm maintained the chiropractic services were either not actually performed or were not necessary.  The arbitrator made clear that there was "crystal clear" evidence the individual was in a car accident and was treated for it, then stated: "I just wonder, if this gentleman's name were Richard Anderson, if we would be here today."

102.    When its decisions to refuse payment for claims are challenged, State Farm often does not prevail.  Despite State Farm's tactics, arbitrators and courts regularly determine that billed treatments were reasonable expenses for necessary chiropractic services.

103.    Examples abound of State Farm discriminating against minority and immigrant patients because of their race or ethnicity. These cases have put State Farm on notice of its discriminatory impact upon minority insureds, and yet State Farm knowingly continues its standard operating procedure of disproportionately targeting providers

serving minority populations. The insureds' race, ethnicity, and/or national origin motivates State Farm's conduct.

104.    In Philadelphia, a chiropractor who owned a large chiropractic and pain-management practice, and whose patients largely consisted of African-American automobile-accident victims, alleged in a lawsuit against State Farm that "[i]f a claimant is a minority, an immigrant, or from a poor, urban area, State Farm automatically looks on their claims as potentially fraudulent." ECF Doc. No. 1 (Complaint) at ¶ 35, *Schatzberg v. State Farm Mut. Auto. Ins. Co.*, Case No. 2:10-cv-02900-GP (E.D. Pa. June 17, 2010).

105.    In Michigan, State Farm brought fraud allegations against a number of medical providers, several of whom filed counterclaims against State Farm.  One typical counterclaim asserted that State Farm had engaged in an "unlawful predetermined claim processing procedure" to deny, delay, and diminish claims related to certain healthcare providers, in violation of Michigan's no-fault insurance act, and that it had discriminated against providers based on their race and national origin. *See, e.g.*, ECF Doc. No. 91 (amended counterclaim filed by eight defendants) at ¶¶ 4, 5, 12, 33–36, 50, *State Farm Mut. Auto. Ins. Co. v. Physiomatrix, Inc.*, Case No. 5:12-cv-11500-JCO-DRG (E.D. Mich. May 24, 2013).[3]

106.    In Arizona, a chiropractor and owner of a sizable multi-location chiropractic and pain-management practice engaged in litigation over several years with

---

[3] *See also State Farm Mut. Auto. Ins. Co. v. Physiomatrix, Inc.*, No. 12-11500, 2013 WL 509284, at *6 (E.D. Mich. Feb. 12, 2013) (dismissing civil-rights claims), *on reconsideration*, No. 12-11500, 2013 WL 3777108 (E.D. Mich. May 22, 2013).

State Farm, asserting that State Farm and two other large insurers were refusing to pay for the treatment of its "predominantly Hispanic patient base," leaving the patients "frequently impoverished, helpless and defrauded," and potentially driving providers like him out of business. ECF Doc. No. 1-1 at 5–7, *Clinica Real, LLC, v. Liberty Mut. Ins. Co. et al.*, Case No. 2:11-cv-00847-NVW (D. Ariz. Apr. 27, 2011). In a related bankruptcy case, the same chiropractor asserted that "[i]f a Claimant is a minority, an immigrant, or from a poor, urban area, State Farm automatically looks at their claims as potentially fraudulent." ECF Doc. No. 1 ¶ 28, *Clinica Real, LLC, v. State Farm Mut. Auto. Ins. Co.*, 2:12-ap-01726-SSC (Bankr. D. Ariz. Oct. 4, 2012).

107.    As part of its strategy to eliminate and avoid paying claims from minority and immigrant insureds, State Farm has brought numerous lawsuits against providers that serve a high percentage of minority or non-English speaking patients, alleging fraud and other illegal actions.

108.    Upon information and belief, State Farm has not brought such lawsuits against providers that serve a high percentage of Caucasian, English-speaking, and native-born Americans. Instead, State Farm pursues these lawsuits in a grossly disproportionate percentage against providers who serve minority populations despite having notice and knowledge of the discriminatory impact on minority insureds.

109.    Rejecting State Farm's appeal in a nationally recognized bad-faith case, the Utah Supreme Court agreed with the trial court that State Farm had engaged in fraudulent practices on a companywide basis for more than two decades, and that "State Farm's fraudulent practices were consistently directed to persons—poor racial or ethnic

537963.16                                        24

minorities, women, and elderly individuals—who State Farm believed would be less likely to object or take legal action." *Campbell v. State Farm Mut. Auto. Ins. Co.*, 65 P.3d 1134, 1148 (Utah 2001), *rev'd on other grounds*, 538 U.S. 408 (2003). State Farm also, according to the Utah Supreme Court, deliberately destroyed documents to conceal the scheme, and it "systematically harassed and intimidated opposing claimants, witnesses, and attorneys." *Id.* State Farm's tactics added up to "a pattern of 'trickery and deceit,' 'false statements,' and other 'acts of affirmative misconduct' targeted at 'financially vulnerable' persons," the Utah court said. *Id.* " . . . The facts and circumstances surrounding State Farm's misconduct all point to a scheme motivated by the goal of making a profit by any means necessary." *Id.* at 1149.

110.    State Farm has also been accused of "redlining" minorities with regard to insurance rates. In 1997, a Texas consumer advocate identified State Farm and four other insurers as among the "worst redliners" in the state, charging higher premiums to minorities than to customers in other neighborhoods.

111.    State Farm's policies of targeting minority populations in Illinois have been documented more recently. In 2017, the nonprofit news organizations ProPublica and Consumer Reports reported that Illinois insurers including State Farm charged drivers more for automobile insurance in minority neighborhoods compared to suburbs with a similar risk profile.[4]

---

[4] *See* Al Shaw et al., *Chicago Area Disparities in Car Insurance Premiums*, ProPublica, (Apr. 5, 2017), https://projects.propublica.org/graphics/carinsurance (accessed Nov. 18, 2019).

**C.  State Farm's discriminatory claims scheme is prohibited by the ACA.**

112.  State Farm is a "covered entity" as defined by 42 CFR § 92.4 because State Farm provides and administers a health program or activity, which receives Federal financial assistance.  State Farm is in the business of providing and administering health-related services and health-related insurance coverage.

113.  State Farm provides for and administers health-related services for individuals who have been injured in automobile accidents under State Farm's policies of no-fault automobile insurance.  Plaintiffs and the proposed class members all received health-related services under policies of insurance issued by State Farm.

114.  In connection with these health-related activities—administering health-related services in connection with automobile policies—State Farm receives federal financial assistance as defined in 42 CFR § 92.4.

115.  State Farm receives federal funds from the U.S. Department of Health and Human Services because it receives a percentage of the premium payments that individual insureds paid to those companies, including a percentage of the premium subsidies (or premium tax credits) sent to the affiliated health carrier by the federal government.

## V.  FACTS SPECIFIC TO NAMED PLAINTIFFS

**Plaintiff Chee Vang**

116.  Plaintiff Chee Vang ("Mr. Vang") was injured in a motor-vehicle accident on December 23, 2017 in the state of Minnesota.

117.    Mr. Vang chose to be treated by chiropractor Jer Lee, D.C. ("Dr. Lee") at Chiro Health Clinic in Brooklyn Center, Minnesota.  Mr. Vang received treatment from Dr. Lee from December 29, 2017 to August 21, 2018.

118.    Mr. Vang also received services for his injuries from the Center for Diagnostic Imaging, Diagnostic Radiology Consultants, Allina Health System, and Midwest Spine & Brain Clinic.

119.    State Farm assigned Mr. Vang's claims to its SIU for handling.

120.    State Farm refused to pay or delayed paying for Mr. Vang's treatment.

121.    State Farm's SIU claims specialist sent several letters to Mr. Vang, his attorney, and his healthcare providers saying that there would be "a delay" in paying the bills and that State Farm's investigation was "ongoing."

122.    State Farm's delay letters provided no specific reasons to delay paying no-fault benefits to Mr. Vang under his insurance policy.

123.    On February 27, 2018, approximately two months after Mr. Vang sustained his injuries and began receiving treatment, State Farm referred his claim to its outside counsel for the purpose of an EUO of Mr. Vang.  Mr. Vang underwent the examination by State Farm's outside counsel on June 11, 2018.

124.    Following the examination, State Farm requested an adverse medical examination of Mr. Vang.

125.    State Farm paid a limited amount of benefits to Mr. Vang only after he filed to have his no-fault claims considered by an arbitrator as authorized by Minnesota law.

126.    The arbitrator ruled in Mr. Vang's favor, finding that his claims were valid.

127.    The arbitrator's award from State Farm to Mr. Vang did not make Mr. Vang whole.

**Plaintiff Yee Vang**

128.    Plaintiff Yee Vang ("Ms. Vang") was injured in a motor-vehicle accident on March 14, 2018 in the state of Minnesota.

129.    Ms. Vang and her passenger, her daughter Mao Lee, were transported from the scene of the accident to North Memorial Health Hospital in Robbinsdale, Minnesota, where their injuries were evaluated and treated.

130.    The next day, Ms. Vang chose Dr. Lee for follow-up treatment of her injuries.  Ms. Vang received treatment from Dr. Lee from March 15, 2018 to September 17, 2018.

131.    State Farm assigned Ms. Vang's claims to its SIU for handling.

132.    State Farm refused to pay or delayed paying benefits for Ms. Vang's claims, including her healthcare treatment and her claim for wage-loss benefits.

133.    State Farm's SIU claims specialists sent several letters to Ms. Vang, her attorney, and her healthcare providers saying that there would be "a delay" in paying the bills and that State Farm's investigation was "ongoing."

134.    State Farm's delay letters provided no specific reasons to delay paying no-fault benefits to Ms. Vang under her insurance policy.

135.   Approximately two months after the accident, a "team manager" for State Farm sent a letter dated May 10, 2018 to Ms. Vang and her attorney asserting that Ms. Vang had not cooperated in its investigation of her claims.

136.   Around this same time, State Farm referred Ms. Vang's claim to its outside counsel for the purpose of an EUO of Ms. Vang.

137.   Ms. Vang did not submit to the EUO.  Instead, in a letter dated May 24, 2018, her attorney provided State Farm's outside counsel with documents and information addressing State Farm's purported concerns.

138.   Because of State Farm's delays in paying Ms. Vang's hospital bill from the day of the crash, Ms. Vang has begun receiving collection notices on behalf of North Memorial Hospital.

139.   Ms. Vang has filed to have her no-fault claims considered by an arbitrator as authorized by Minnesota law.

**Plaintiffs Xeng Thao and J.Y.**

140.   Plaintiff Xeng Thao ("Mr. Thao") was injured in a motor-vehicle accident on November 21, 2017 in the state of Minnesota.

141.   Mr. Thao was a named insured on an automobile-insurance policy purchased from State Farm. Yeng Her, Mr. Thao's wife, was also a named insured on the policy.

142.   Mr. Thao and his passenger, his stepdaughter J.Y., chose Dr. Lee for follow-up treatment of their injuries.  Mr. Thao received treatment from Dr. Lee from

November 22, 2017 to October 31, 2018. J.Y. received treatment from Dr. Lee from November 22, 2017 to May 1, 2018.

143.    Besides Chiro Health Clinic, Mr. Thao received healthcare services from Diagnostic Radiology Consultants, Noran, Auto Rx, Minnesota Institute for Pain Management, and ICare Diagnostic Imaging.

144.    Besides Chiro Health Clinic, J.Y. received healthcare services from Diagnostic Radiology Consultants.

145.    State Farm assigned Mr. Thao's and J.Y.'s claims to its SIU for handling.

146.    State Farm refused to pay or delayed paying benefits for Mr. Thao's and J.Y.'s claims.

147.    State Farm's SIU claims specialists sent several letters to J.Y.'s stepfather Mr. Thao, her attorney, and her healthcare providers saying that there would be "a delay" in paying the bills for Mr. Thao's and J.Y.'s treatment and that State Farm's investigation was "ongoing."

148.    State Farm's delay letters provided no specific reasons to delay paying no-fault benefits to Mr. Thao or J.Y. under the insurance policy that covered them.

149.    State Farm requested that Mr. Thao submit to an EUO.   Mr. Thao underwent the EUO on June 11, 2018.   State Farm's questions primarily focused on details of the treatment Mr. Thao remembered receiving from Dr. Lee.

150.    Mr. Thao filed to have his no-fault claims considered by an arbitrator as authorized by Minnesota law. Shortly before the date of the arbitration, State Farm paid much of the benefits due to Mr. Thao.

151.    State Farm has refused to pay Mr. Thao's bills from Minnesota Institute for Pain Management or ICare Diagnostic Imaging even though he prevailed at the no-fault arbitration in July 2018.

152.    J.Y. filed to have her no-fault claims considered by an arbitrator as authorized by Minnesota law.  Shortly before the date of the arbitration, State Farm paid nearly all the benefits due to J.Y.

153.    Despite State Farm's fabricated reasons to delay or deny paying benefits in each case, the above-named Plaintiffs had one crucial thing in common: Payments to them or their healthcare providers were held up and targeted for unlawful, racially discriminatory scrutiny by State Farm because State Farm had secretly imposed a TIN diversion or TIN block on Dr. Lee and Chiro Health Clinic.

154.    State Farm never told the above-named Plaintiffs that State Farm had secretly imposed a TIN diversion or TIN block on Dr. Lee and Chiro Health Clinic.

155.    State Farm never told the above-named Plaintiffs that the reason for the TIN blocks or TIN diversions was State Farm's policy to discriminate against patients on the basis of race, targeting minorities and immigrants' claims for special investigation.

156.    In all these cases, State Farm's delays ignored and violated Minnesota's no-fault insurance "prompt-pay" statute, under which benefits are overdue if not paid within 30 days after the insurer receives reasonable proof of the fact and amount of loss realized. See Minn. Stat. § 65B.54, subd. 1.

157.   As a direct and proximate result of the wrongful actions of State Farm described above, each of the above-named Plaintiffs have been harmed and will continue to be harmed as recounted in detail below.

## VI.   CLASS-ACTION ALLEGATIONS

158.   State Farm systematically and intentionally targets certain healthcare providers who serve minority populations in no-fault states for the purported (but false) reason of detecting fraud.  State Farm uses this company-wide, intentional practice to knowingly discriminate against minority and immigrant insureds who receive treatment from such providers to deny payment of their health-insurance claims. This practice violates Section 1557 of the ACA, which extends anti-discrimination protections of the existing civil-rights laws to the administration of health-related insurance coverage, as well as 42 U.S.C. § 1981.

159.   Plaintiffs therefore request the Court certify this lawsuit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

160.   Plaintiffs seek to certify the following Class pursuant to Rule 23:

All persons in the United States who had coverage under a policy issued by Defendant for medical or chiropractic expenses and who sought payment for services for medical or chiropractic expenses (or had another person seek payment under the person's policy) from a provider that was subjected to a TIN diversion or TIN block by Defendant (hereinafter the "Class").

161.   Plaintiffs and the putative Class members share an interest in being treated the same as all other State Farm policyholders who do not seek treatment from a healthcare provider subject to a TIN block by State Farm through no fault of their own.

162.    **Numerosity:** Upon information and belief, the members of the Class number in at least the tens of thousands.  Plaintiffs' source for this belief includes State Farm's statement on its web site that it has nearly 83 million policies and accounts in force in the U.S., including policies for health insurance, bodily injury coverage, and PIP coverage.[5]  As a result, the Class is so numerous that joinder of all members in a single action is impracticable.  The members of the Class are readily identifiable from State Farm's records.  The disposition of these claims will provide substantial benefits to the Class.

163.    **Commonality:** The Class is so cohesive that aggregate litigation is appropriate.  State Farm has acted or refused to act on grounds that apply generally to the class, so that injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.  Thus, Class members' claims—the core being that State Farm discriminated against them on the basis of race, ethnicity, or nationality—are so inherently intertwined that injunctive relief as to anyone in the Class will constitute injunctive relief as to all.  Further, the Class's claims are so common that they may be determined without reference to individual circumstances and will justify injunctive relief appropriate for all members of the Class.  The following represent a non-exhaustive list of common questions:

> a.  Whether State Farm maintains a company-wide scheme designed to deny or delay all claims associated with healthcare providers who primarily serve minority and immigrant patient populations;

---

[5] *See* Fast Facts, https://www.statefarm.com/about-us/company-overview/company-profile/fast-facts.

b.  Whether State Farm targets healthcare providers whose practices exceed certain billed amounts by imposing TIN diversions on them;

c.  Whether State Farm has a policy of applying investigative techniques differently or disproportionately as to minority and immigrant insureds, compared to Caucasian and United States native-born insureds;

d.  Whether State Farm launches sham investigations of the targeted healthcare providers so as to generate information supporting denial of claims;

e.  Whether State Farm's sham investigations of the targeted healthcare providers are actually intended to limit treatment to patients/insureds in minority and immigrant communities;

f.  Whether State Farm's scheme to investigate targeted providers, while it purports to be investigating the merits of claims, constitutes fraud; and

g.  Whether, because of State Farm's conduct, Plaintiffs and the Class are entitled to injunctive relief, restitution, equitable relief, incidental damages, and other relief, and, if so, the amount and nature of such relief.

164.  **Typicality:** The Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and all members of the Class were injured by the same wrongful practices perpetrated by State Farm, as described above.  Plaintiffs experienced the same discrimination when State Farm targeted their healthcare providers for TIN diversions, sham investigations, and TIN blocks, and the other facets of the scheme described above. Plaintiffs are also typical because regardless of the facts of their claims, State Farm's scheme—especially the targeting of providers serving minority and immigrant patient populations, and the misrepresentations regarding claims being under "investigation"— did not substantially differ among or between patients.  Further, Plaintiffs and members

of the Class seek relief based on the same legal theories. The injunctive relief against State Farm's practices will apply to all members of the Class.  Any incidental damages sustained by members of the Class can be determined readily.

165.  **Adequacy of Representation:** Plaintiffs will fairly and adequately protect and pursue the interests of the Class.  Plaintiffs understand the nature of the claims herein, their role in the proceedings, and have and will vigorously represent the Class. Plaintiffs have retained Class counsel who are experienced in and qualified in prosecution of class actions and other forms of complex litigation.  Neither Plaintiffs, nor their attorneys, have interests that are contrary to or conflict with those of the Class.

166.  **Necessity:** Even if a Court in this district were to apply the so-called "necessity doctrine," a class action is necessary here as the only just way to adjudicate Plaintiffs' and the Class's claims.  State Farm's history of discrimination creates doubt that it would apply required relief here to its insureds across the board, and State Farm may seek to render named plaintiffs' claims moot.  Plaintiffs are unaware of any reason this litigation should not proceed as a class action.

167.  Plaintiffs contemplate that notice to the Class would be accomplished by direct mail upon certification of the Class or, if such notice is not practicable, by best notice possible under the circumstances including, *inter alia*, email, publication in major newspapers, and maintenance of a website.

## VII.   TOLLING AND ESTOPPEL

168.   Plaintiffs' causes of action did not arise until they discovered, or by the exercise of reasonable diligence should have discovered, that they were injured by State Farm's intentional and deliberate scheme.   Plaintiffs did not and could not have discovered the intentional scheme through reasonable diligence.

169.   The applicable statutes of limitations have been tolled by State Farm's knowing and active concealment of the material facts regarding its scheme to intentionally discriminate against and lie to patients and their healthcare providers.   State Farm kept Plaintiffs and the members of the Class ignorant of the vital information essential to pursue their claims, without any fault or lack of diligence on the part of Plaintiffs and Class members.

170.   State Farm was and is under a continuous duty to disclose to Plaintiffs and the Class the true nature of the scheme that it created and implemented to intentionally discriminate against and lie to patients and their healthcare providers.   At all relevant times, and continuing to this day, State Farm knowingly, affirmatively, and actively misrepresented and concealed the true character, quality, and nature of its scheme.

171.   Based on the foregoing, State Farm must be estopped from relying on any statute-of-limitation defense in this action. State Farm must also be estopped from relying on any statute-of-limitation defense in this action because it failed to disclose the scheme before accepting premium payments in exchange for automobile-insurance coverage.

172.    Under the doctrines of Equitable Tolling, Equitable Estoppel, Fraudulent Concealment and the Discovery Rule, the period for bringing claims is not barred by any statute of limitations or statute of repose.  With respect to each cause of action asserted herein, Plaintiffs expressly plead Equitable Tolling, Equitable Estoppel, Fraudulent Concealment, and the Discovery Rule, regarding the facts pleaded here.

173.    All conditions precedent to the filing of this Complaint (if any) have been satisfied.  This action is filed before the expiration of any applicable statute of limitations or statute of repose.

## VIII.  CAUSES OF ACTION

### COUNT I
### ACA DISCRIMINATION, 42 U.S.C. § 18116
### (For the Class)

174.    At all times relevant to this action, Section 1557 of the Patient Protection and Affordable Care Act ("Section 1557"), 42 U.S.C. § 18116, was in full force and effect and applied to State Farm's conduct as pleaded in this Complaint.

175.    Section 1557 achieves the ACA's overarching goal of expanding access to health care and insurance for all individuals, as discrimination within health programs can contribute to poor and inadequate health outcomes or coverage, exacerbate existing health disparities in underserved communities, and lead to insufficient and ineffective distribution of healthcare resources.  Accordingly, Section 1557 coordinates existing federal anti-discrimination laws and extends them to health programs and activities.

176.    At all times relevant in this action, Section 1557 incorporated the definition of discrimination found in the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.).

177.    Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, provides that:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

178.    Section 1557 provides that:

Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) . . .  be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under . . . title VI . . . shall apply for purposes of violations of this subsection.

179.    Title VI defines a "program or activity" to include a "corporation" if federal financial assistance is extended to the corporation or, alternatively, if the corporation is "principally in the business of providing . . . health care . . . ." *Id.* at § 2000d-4a (emphasis added).

180.    State Farm issues automobile-insurance policies that cover medical expenses for its customers.

181.    State Farm also offers group health coverage, individual medical, and Medicare supplemental insurance policies. As described above, State Farm received subsidy payments through individuals that purchased health policies.

182.    Therefore, at all times relevant to this action, State Farm received federal financial assistance in the form of ACA subsidy payments, was principally engaged in the

business of insuring the cost of health care required after its insureds sustained injuries in automobile accidents, or both.  State Farm is a health program or activity covered by 42 U.S.C. § 18116(a).

183.   State Farm has discriminated and continues to discriminate against Plaintiffs on the basis of race, ethnicity, and national origin by the practices described above. Although anti-fraud tools can be used for legitimate purposes, State Farm unlawfully wields those tools disproportionately against minority and immigrant patients and their healthcare providers.

184.   State Farm's conduct had a disparate impact on Plaintiffs and State Farm continues its conduct despite notice and knowledge of the disparate impact on Plaintiffs. The disparity on minority and immigrant insureds was the direct result of State Farm's systematic practices, the practices were not necessary to prevent fraudulent claims, and State Farm could have chosen other methods for detecting fraud that were effective and less discriminatory.

185.   Not only did State Farm's conduct create a disparate impact on the plaintiffs and the putative class, but State Farm also engaged in intentional, disparate treatment of the plaintiffs and the putative class members.  State Farm intentionally and knowingly engaged in a company-wide policy or practice to sell insurance to and collect premiums from minority and immigrant customers while systematically evading claims for insurance benefits submitted by those same customers.

186.   State Farm's conduct was motivated by knowing and intentional discrimination based on race, ethnicity, and nationality of its insureds.

187.    As set forth above, absent injunctive relief there is a clear risk that State Farm's actions will recur with Plaintiffs and other minority and immigrant patients and their family members.

188.    Plaintiffs are therefore entitled to seek and receive injunctive relief, plus incidental damages for injuries and losses they sustained as a result of State Farm's discriminatory conduct and deliberate indifference as herein alleged. 42 U.S.C. § 18116(a); Fed. R. Civ. P. 23(b)(2).

189.    Plaintiffs are further entitled to an award of attorney's fees, costs, and disbursements pursuant to 42 U.S.C. § 18116(a) and 42 U.S.C. § 2000d (title VI).

**COUNT II**
**DISCRIMINATION UNDER 42 U.S.C. § 1981**
**(For the Class)**

190.    Plaintiffs incorporate herein by reference each and every paragraph above as though fully set forth herein.

191.    At all times relevant to this action, 42 U.S.C. § 1981 was in full force and effect and applied to State Farm's conduct as pleaded in this Complaint.

192.    Under section 1981(a), "[a]ll persons . . . shall have the same right . . . to make and enforce contracts, . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a).  The section goes on to define "make and enforce contracts" as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id*. § 1981(b).

193.    By the conduct described above in its handling of Plaintiffs' claims, State Farm intentionally denied Plaintiffs the benefits and privileges of their automobile insurance policy contracts, and thus the right to enforce those contracts.

194.    State Farm intentionally denied Plaintiffs the benefits and privileges of insurance policy contracts, and thus the right to enforce those contracts, that is enjoyed by State Farm's white customers and insureds.

195.    Although State Farm may wish to use its data and anti-fraud tools to scrutinize and avoid certain kinds of claims, the company may not lawfully decide to wield those tools disproportionately against minority and immigrant patients and their healthcare providers.

196.    State Farm's practices are the result of a company-wide policy or practice of State Farm to sell automobile insurance to minority and immigrant customers while systematically evading claims for insurance benefits submitted by those same customers.

197.    There was a causal nexus between State Farm's contacts with the forum state—namely, the development at its Bloomington headquarters of practices and procedures about which Plaintiffs complain—and Plaintiffs' section 1981 cause of action.

198.    As set out above, absent injunctive relief there is a clear risk that State Farm's actions will recur again with Plaintiffs and other minority and immigrant patients and their family members.

199.    Plaintiffs are therefore entitled to injunctive relief and any incidental damages they sustained as a result of State Farm's discriminatory conduct and deliberate indifference as herein alleged.  42 U.S.C. § 2000d (title VI); Fed. R. Civ. P. 23(b)(2).

200.    Plaintiffs are further entitled to an award of attorney's fees, costs, and disbursements pursuant to 42 U.S.C. § 1981.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray that this Court enter the following judgment, in Plaintiffs' favor:

1.    That a permanent injunction issue enjoining State Farm from further violations of law as described above and commissions of the fraudulent actions described herein;

2.    That Plaintiffs be awarded incidental damages as appropriate;

3.    That Plaintiffs be awarded their costs, attorneys' fees, expenses, and pre-judgment and other statutory interest on any incidental monetary damages;

4.    That the Court provide such other relief to Plaintiffs as is just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury for all for all issues so triable.

Dated: July 10, 2020

Respectfully submitted,

By:    *s/ David W. Asp*

Susan E. Ellingstad (*admitted per LR 83.5*)
David W. Asp (*admitted per LR 83.5*)
Eric N. Linsk (*admitted per LR 83.5*)
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone:    (612) 339-6900
Facsimile:    (612) 339-0981
Email:        seellingstad@locklaw.com
Email:        dwasp@locklaw.com
Email:        RNlinsk@locklaw.com

**ZIMMERMAN REED LLP**
J. Gordon Rudd, Jr. (*to be admitted per LR 83.5*)
David M. Cialkowski (*to be admitted per LR 83.5*)
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone:    (612) 341-0400
Facsimile:    (612) 341-0844
Email:        gordon.rudd@zimmreed.com
Email:        david.cialkowski@zimmreed.com

*Attorneys for Plaintiffs*